UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SALIM SAADIA and<br>RAVI ALLAHAB,<br><br>Defendants. | **SEALED INDICTMENT**<br><br>24 Cr.<br><br>**24CRIM 612** |

The Grand Jury charges:

**Overview**

1. From at least in or about 2021 through at least in or about 2024, SALIM SAADIA and RAVI ALLAHAB, the defendants, and others known and unknown, used a company ("Company-1")—a wholesaler and reseller of cellphones, tablets, and other electronic devices—and at least five other purported cellphone resellers (the "Cellphone Resellers") to launder over $10 million of narcotics proceeds.

2. Specifically, for nearly three years, SALIM SAADIA, the Co-founder and Chief Executive Officer of Company-1, and RAVI ALLAHAB, a manager at Company-1, the defendants, used Company-1 to operate a covert, cash-only business through which individuals engaged in narcotics trafficking used drug proceeds to purchase cellphones and other electronic devices from Company-1 on behalf of several Mexico-based businessmen. Once purchased, SAADIA and ALLAHAB caused Company-1 to ship those cellphones and other electronic devices to a storage facility in San Diego, California where individuals working on behalf of those Mexico-based businessmen took possession of those products and, presumably, arranged for them to be carried across the border with Mexico. The Mexico-based businessmen used the cellphones and

other electronic devices purchased from Company-1 as a way of transporting drug proceeds back to Mexico under the guise of legitimate trade.

3. During the same period, RAVI ALLAHAB, the defendant, regularly communicated with Mexico-based businessmen regarding ALLAHAB's receipt of bulk cash from narcotics traffickers. For example, in the conversations between ALLAHAB and a particular Mexico-based businessmen, CC-1, ALLAHAB continuously updated CC-1 with amounts of money that were being credited to CC-1, which matched (i) the dates and amounts of money being delivered to ALLAHAB by narcotics traffickers and (ii) the dates and amounts of money referenced in the conversations ALLAHAB had with SALIM SAADIA, the defendant, regarding CC-1. ALLAHAB also sent CC-1 multiple lists of phones that Company-1 had in stock, along with a list of prices. CC-1 then often negotiated prices with ALLAHAB and ALLAHAB sometimes referenced discussions with his "boss," SAADIA. ALLAHAB confirmed cellphone orders for CC-1 by sending CC-1 pictures of shipping labels directed to a self-storage facility located in San Diego, California. In addition, ALLAHAB sent invoices to CC-1 for the cellphone shipments CC-1 was receiving in exchange for the cash.

4. In total, Company-1 laundered more than $10 million worth of narcotics proceeds during this scheme. Over approximately the same period, RAVI ALLAHAB, the defendant, received tens of thousands of dollars in commissions from Company-1 for the cellphones and other electronic devices he sold to CC-1's company and other similar Mexico-based companies, while SALIM SAADIA, the defendant, withdrew more than $800,000 from Company-1 for his own personal benefit.

5. During the same period—that is, when SALIM SAADIA and RAVI ALLAHAB, the defendants, were coordinating the receipt of more than $10 million from narcotics traffickers working on behalf of CC-1 and others—SAADIA and ALLAHAB worked with the

owners of at least five smaller cellphone resellers—the Cellphone Resellers—to transfer at least some of the cash that Company-1 received from the narcotics traffickers to the Cellphone Resellers. The Cellphone Resellers, in turn, returned the value of that cash to Company-1 through wire payments that were part of or disguised as ordinary course business transactions. Those Cellphone Resellers include: (i) CC-2, CEO and Founder of Cellphone Reseller-2; (ii) CC-3, President of Cellphone Reseller-3; (iii) CC-4, member of Cellphone Reseller-4; and (iv) CC-5, CEO of Cellphone Reseller-5. This was done in concert with another executive at Company-1, CC-6, and in order to disguise the illicit nature and origin of the funds that were coming into Company-1 as a result of this scheme. For Example:

    a.    On or about December 12, 2022, after sending a message to SAADIA updating him on the fact that CC-1 had dropped an additional $20,000 to Company-1 on or about December 11, 2022, ALLAHAB asked SAADIA directly about where to deliver the cash: "Wats up which [person] I'm giving this money too [sic]??" In response, SAADIA sent ALLAHAB the contact information for CC-3, the purported President of Cellphone Reseller-3. The next day, on or about December 13, 2022, bank records for Cellphone Reseller-3 and Company-1 establish that Cellphone Reseller-3 sent Company-1 a wire for $23,660.

    b.    Approximately two months after that, on or about February 3, 2023, ALLAHAB sent SAADIA a message stating, "Sal send me the two guys phone # for the boxes please." SAADIA responded by sending ALLAHAB the contact information for CC-5, the purported CEO of Cellphone Reseller-5, and for CC-3. SAADIA also wrote ALLAHAB, "Ask [CC-6] for [CC-4's] #." ALLAHAB then wrote back, "Done," in response to receiving CC-5's contact information from SAADIA, and "Going too [sic] him now," in response to receiving CC-3's contact information from SAADIA. ALLAHAB also wrote SAADIA, "[CC-4] tomorrow [is] not home, [CC-6] told me." Approximately three days later, on or about February 6, 2023,

Cellphone Reseller-3—CC-3's company—sent Company-1 a wire for $64,000; Cellphone Reseller-4—CC-4's company—sent Company-1 a wire for $170,000; and Cellphone Reseller-5—CC-5's company—sent Company-1 a wire for $69,850.

       c.     Around approximately the same time, that is, on or about February 5, 2023, SAADIA also sent ALLAHAB contact information for CC-2, the purported CEO and Founder of Cellphone Reseller-2. In the conversation that ensued, SAADIA and ALLAHAB discussed a discrepancy between the number of "bundles" of cash that CC-2 was supposed to receive from ALLAHAB and the number of "bundles" of cash that CC-2 claims to have received from ALLAHAB. ALLAHAB messaged SAADIA that he (ALLAHAB) did not tell CC-2 an amount, but rather "just gave him the box." To solve this dispute over money, ALLAHAB suggested that SAADIA check "the safe" to see what remained there: "Maybe I made a mistake, I put 32 not 33. Are u able too [sic] check wat u have in the safe and then check??" On or about the same day, that is, on or about February 5, 2023, ALLAHAB went to see CC-2 at CC-2's home. The next day, that is, on or about February 6, 2023, Cellphone Reseller-2—CC-2's company—sent Company-1 a wire for $127,960.

       6.     In addition, SALIM SAADIA and RAVI ALLAHAB, the defendants, along with CC-6 also used another Cellphone Reseller owned by CC-6—that is, Cellphone Reseller-1—to transfer cash that SAADIA and ALLAHAB received from narcotics traffickers back into Company-1's business in a concealed manner. For example, between in or about February 2021 and in or about February 2023, Cellphone Reseller-1 sent approximately 19 different checks to Company-1 totaling over $417,000. For each of those checks, either on the day of the check or in the days leading up to the check, Cellphone Reseller-1 made significant cash deposits that appeared to fund the checks to Company-1. In fact, during approximately the same period that Cellphone

Reseller-1 sent over $417,000 in checks to Company-1, Cellphone Reseller-1 deposited approximately $450,000 in cash.

## Statutory Allegations

### COUNT ONE
### (Money Laundering Conspiracy)

7. From at least in or about 2021 through at least in or about 2024, in the Southern District of New York and elsewhere, SALIM SAADIA and RAVI ALLAHAB, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit money laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

8. It was a part and object of the conspiracy that SALIM SAADIA and RAVI ALLAHAB, the defendants, and others known and unknown, knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions, which transactions affected interstate and foreign commerce and involved the use of a financial institution which was engaged in, and the activities of which affected, interstate and foreign commerce, and which in fact involved the proceeds of specified unlawful activity, to wit, the distribution and possession with intent to distribute controlled substances including fentanyl, in violation of Title 21, United States Code, Section 841, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Section 1956(h).)

## FORFEITURE ALLEGATIONS

9. As a result of committing the offense alleged in Count One of this Indictment, SALIM SAADIA and RAVI ALLAHAB, the defendants, shall forfeit to the United

States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offense, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense.

## SUBSTITUTE ASSETS PROVISION

10. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Section 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

_____  
FOREPERSON

_____  
DAMIAN WILLIAMS  
United States Attorney